In re INDIAN MOTOCYCLE COMPANY, INC., Debtor.

In re Indian Motocycle Apparel and Accessories Co., Inc., Debtor.

In re Indian Motocycle Manufacturing Company, Inc., Debtor.

Nos. 93–41954–HJB, 93–41955– HJB, 94–42288–HJB.

United States Bankruptcy Court, D. Massachusetts.

Aug. 3, 2001.

---

See also 245 F.3d 1161.

Paul W. Carey, Esq., Mirick, O'Connell, DeMallie & Lougee, LLP, Worcester, MA, for Sterling Consulting Corp.

Peter Sklarew, Esq., U.S. Department of Justice, Washington, DC, for United States of America.

### *MEMORANDUM OF DECISION*

HENRY J. BOROFF, Bankruptcy Judge.

Before this Court are two motions, which while not strictly related, share a common fact pattern and common issues of law and concern. The first is an *"Ex Parte* Emergency Motion of the United States to Enforce the Judgment of the B.A.P and the Automatic Stay, and For Related Relief" (the "Government Motion"). By Order of May 18, 2001, supported by a Memorandum of Decision of the same date, this Court denied the *ex-parte* relief sought by the United States. Now before this Court are the merits of the Government Motion. The United States asks this Court to (i) order Sterling Consulting Corporation, the appointed Receiver of Indian Motorcycle Manufacturing, Inc. in *Eller Industries, Inc. v. Indian Motorcycle Manufacturing, Inc.*, Civ. Action 95–Z–777 (D.Colo.)(the "Receivership Proceeding"), to return $1.2 Million Dollars distributed to the Receiver as escrow agent under this Court's order of December 30, 1999, together with interest accrued thereon; (ii) find and rule that the Receiver has violated the automatic stay under 11 U.S.C. §§ 362(a)(3) and

(a)(6) on account of its refusal to return such funds to date and on account of its allegedly ongoing attempts in the Receivership Proceeding to secure discovery from the United States with respect to an alleged administrative tax obligation of these bankruptcy estates; and (iii) award damages to the United States on account of those violations.

Also before the Court is a "Motion to Change Venue" (the "Venue Motion") filed by the Receiver at the urging of the Magistrate Judge assigned to the Receivership Proceeding in Colorado (the "Magistrate"). The Receiver asks that, pursuant to 28 U.S.C. § 1412, this Court transfer the venue of these bankruptcy cases, or alternatively the contested matter relating to any administrative claim made by the United States against the bankruptcy estates, to the United States District Court for the District of Colorado (the "District Court") where the reference thereto can be withdrawn in favor of the District Court.

## I. BACKGROUND AND TRAVEL OF THE CASE

On July 15, 1993, involuntary Chapter 7 petitions were filed in this Court against Indian Motocycle Company, Inc. and Indian Motocycle Apparel and Accessories Company, Inc., affiliated corporations. In February of 1994, Indian Motocycle Manufacturing, Inc. filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the District of North Carolina. Venue was transferred to this Court, and that case was subsequently converted to Chapter 7 as well. In January of 1995, this Court ordered that the three estates be jointly administered and a single Chapter 7 trustee was appointed.

In 1995, the Receivership Proceeding was commenced against Indian Motorcycle Manufacturing, Inc. (a fourth company) in the District Court in Colorado. In October of 1995, the Receiver claimed to have purchased 100% of the stock of the bankruptcy debtors as well as certain claims against them. Thus, the Receiver claims to be both a creditor of the bankruptcy debtors and the owner of their equity.

Shortly after the commencement of these jointly administered cases, the Trustee in Bankruptcy of these bankruptcy estates [1] (the "Trustee") found himself engaged in ongoing negotiations, disputes and litigation with the Receiver. Those disputes emanated primarily from the competing claims of the bankruptcy and receivership estates to the Indian Motorcycle trademarks and intellectual property (jointly the "Trademarks") and from the intertwined relationships between the creditors and stockholders of the bankruptcy and receivership estates. The effort to resolve those disputes has engendered, from time to time, great contentiousness by the Trustee and the Receiver in dealing with each other and with third parties.

After considerable negotiation, the original Trustee and the Receiver entered into an agreement for the joint sale of the assets by the bankruptcy estates and the receivership estate. On or about December 12, 1995, the Receiver filed with this Court its "Motion for Approval of Receiver's Request for Procedural Order Approving a Procedural Plan for a Coordinated Sale and Coordinated Interim Administration of the Massachusetts Bankruptcy Cases and the Receivership" (the "Coordinated Sale Motion"). Differences between the parties remained, but they too were

---

1. The first appointed Trustee and his successor are interchangeably referred to as the "Trustee," unless otherwise noted.

settled, and the Trustee and the Receiver subsequently filed their "Joint Motion for Approval of Stipulation Regarding Coordinated Sale and Coordinated Administration." This Court approved that Stipulation. In essence, the parties agreed that the value in the Trademarks was so great that all creditors in both the receivership and bankruptcy cases would be paid in full. Accordingly, the Receiver and the Trustee agreed to temporarily put aside their conflicting claims to the Trademarks and work together to locate a buyer. Further, in light of the seemingly overlapping jurisdiction by this Court and the District Court over the Trademarks until title thereto was determined, it was agreed that the Receiver would take the lead role in locating and negotiating with an appropriate buyer, but no sale could be consummated absent approval of both the District Court and this Court.

Problems continued, notwithstanding the Receiver's earlier promises to ensure that all bankruptcy creditors would be paid in full. When a buyer (IMCOA Licensing America, Inc. ("IMCOA")) for the Trademarks was located in late 1998, the Receiver sought in the sale agreements to impose a cap on funds to be paid on account of the bankruptcy estate creditors or exclude some bankruptcy estate creditors altogether. When this Court indicated its inclination not to approve the sale under those conditions, the Trustee and the Receiver agreed to settle their newest dispute by placing in escrow under their joint signature and control the sum of $3.5 million of the total sale price of $17.3 million (plus other consideration). Although the Receiver reserved his right to assert competing claims to those escrowed funds, the Trustee assured the Court that the amount

escrowed was more than sufficient to pay all bankruptcy estate claims in full. Accordingly, on January 13, 1999, this Court approved the sale to IMCOA. But, in a separate unpublished Memorandum of Decision of even date, the Court severely criticized the Receiver for what appeared to this Court to be inappropriate conduct, including actions seemingly designed to goad a jurisdictional dispute between this Court and the District Court.[2]

Not unexpectedly, following the approval of the sale, the Receiver and the Trustee had multiple disagreements as to the disposition of the $3.5 million held in escrow, including claims by the Receiver that it was entitled to certain of the funds. But, on September 9, 1999, the Trustee filed a "Motion of Trustee to Authorize and Approve Mutual Release and Settlement Agreement with Sterling Consulting Corporation, as Receiver" (the "Settlement Motion"; the "Release and Settlement Agreement"). In summary, the Release and Settlement Agreement provided for immediate payment to the Receiver out of the escrowed funds on account of a $550,000 superpriority lien claim asserted by the Receiver; allowance (but subordinated to allowed bankruptcy estate claims) of a claim allegedly purchased by the Receiver (the "Mandleman Judgment"); an acknowledgment by the Trustee that payment in full of bankruptcy claims would not include postpetition interest; a promise of payment of the residue to the Receiver after bankruptcy estate claims had been paid in full; mutual releases[3]; and complex schema for the division of the seemingly overlapping jurisdiction by and between this Court and the District Court assuming that various contemplated (and

---

**2.** The descriptions in the aforesaid Memorandum of Decision, dated January 13, 1999, are incorporated herein by reference.

**3.** For reasons never fully explained, the Receiver had earlier asserted some sort of claim directly and personally against the Trustee.

non-contemplated) disputes might arise.[4] Most relevant here, the escrowed funds were now entrusted exclusively to the Trustee, with the Receiver's claims now asserted in the same fashion as might be asserted by any other creditor or equity security holder. The Release and Settlement Agreement provided, in pertinent part:

6. *Escrowed Funds/Signature Requirements.* Promptly, and in no event later than seven business days after payment of the Superpriority Lien in the amount of $550,000, the receiver and the Trustee shall take any and all actions and execute and deliver any and all documents or instruments as may be necessary to *terminate the joint signature requirement with respect to the Escrowed Funds or to transfer them to a new account such that the Trustee shall have sole signature authority with respect to the balance of the Escrowed Funds. The Trustee thereafter shall have sole signature authority with respect to the Escrowed Funds, provided, however, that the Trustee shall not make any payment except on account of Allowed Claims, and shall not make any payment on account of Allowed Claims that exceed the amount allowed or estimated in the Schedule filed with the District Court ..., unless he obtains the prior consent of the receiver or an order of the Massachusetts Bankruptcy Court, after notice to the receiver, authorizing such payment.*

. . . .

11. *Jurisdiction and Venue.* The Trustee and the receiver agree and acknowledge that due to the *in rem* nature of the Bankruptcy and the Receivership, disputes between the Trustee and the receiver tend to arise in both cases. In an effort to minimize jurisdictional disputes between the Bankruptcy Court and the District Court, the Trustee and the receiver agree to the following concerning the appropriate venue for any action or legal proceedings to enforce the Settlement Agreement or any of its terms or for the recovery of any loss by the Trustee or the receiver, or for any disputes between the Trustee and the receiver:

. . .

c. Receiver's Claims in the Bankruptcy Estate—Any dispute regarding any claim (including the Superpriority Lien) that has been filed in the Massachusetts Bankruptcy Court by the receiver shall be .... [heard in the Bankruptcy Court first, but subject to limited review by the District Court].... For purposes of this paragraph, the receiver's claims shall include, without limitation, the Superpriority Lien, the Mandelman Judgement, and any distribution of the Escrowed Funds *except to holders of allowed claims for administrative expenses and to third party claimants in the Bankruptcy Estate.*

(Emphasis added).

The purpose and effect of the Release and Settlement Agreement was threefold. First, the agreement reflected a final resolution of the dispute over the funds to which the bankruptcy estates were entitled

---

4. One of those contemplated disputes was with respect to any claim by the United States against the bankruptcy estates. In light of the Receiver's obvious interest in any residue after bankruptcy claims were paid in full and the Trustee's lack of interest in the funds after payment of all administrative tax and bankruptcy claims, the Trustee agreed to prepare and file the returns, but the Receiver agreed to "utilize the procedures in the District Court to have all federal tax returns approved on an expedited basis, consistent with Section 505 of the Bankruptcy Code." (Release and Settlement Agreement ¶ 11(g).)

from the sale of the Trademarks. Second, the agreement reflected a final resolution as to the nature of the receiver's claims against the estate and how those claims would be treated. Third, the agreement delineated the jurisdiction of each of the bankruptcy court and the District Court as future disputes might arise. The District Court approved the Release and Settlement Agreement first; and, subsequently, on September 21, 1999, over the objection of the United States trustee,[5] this Court granted the Settlement Motion, thereby granting the Trustee leave to enter into the said Agreement.

On or about October 29, 1999, the Trustee filed all of the relevant bankruptcy estate tax returns with the Internal Revenue Service, together with a request for an expedited audit under 11 U.S.C. § 505(b). Pursuant to the provisions of the Release and Settlement Agreement, the Receiver simultaneously filed with the District Court two motions seeking the District Court's determination of the tax liability of both the receivership and the bankruptcy estates. The United States objected in the Receivership Proceeding on jurisdictional grounds, claiming that the District Court lacked jurisdiction to determine the tax liability of the bankruptcy estates. The District Court overruled that objection, and ruled that it had jurisdiction over all matters which might affect the receivership estate, including the right to determine the tax liability of the bankruptcy estates. The United States appealed the District Court determination to the Tenth Circuit Court of Appeals.

In the meantime, in late December of 1999, the Trustee and the Receiver became convinced that, for reasons not relevant here, final distribution of monies to creditors of the bankruptcy estates before year's end afforded significant tax advantages for each estate. However, at that time, the Receiver and the Trustee still found themselves at odds with the United States with respect to the administrative tax liability, if any, of the bankruptcy estates to the United States. The ongoing dispute with the United States remained an obstacle to a final distribution. A plan to overcome that obstacle was formed by the Receiver and the Trustee. On December 22, 1999, the Trustee filed his final accounts in each of the bankruptcy cases and asked for expedited determination. At the hearing, the Trustee and the Receiver suggested that the Court authorize the Trustee's request for approval of a final distribution to creditors of the bankruptcy estates. The sum of approximately $437,000 would be distributed to the Receiver, but be held in escrow for the United States pending the District Court determination of the amount due. The United States objected. It argued again that the District Court had no jurisdiction to determine the tax obligation of the bankruptcy estates, notwithstanding the Receiver's claim to the residue of the escrowed funds. It further argued that the administrative tax obligation of the bankruptcy estates might approximate as much as $1.2 million. Attempting to accommodate the concerns of the United States (but concededly over its objection), this Court, on December 30, 1999, estimated the claim of the United States at $1.2 million for the purposes of distribution, pursuant to 11 U.S.C. § 502(c) and granted the Trustee leave, inter alia, to (i) transfer $1.2 million to the Receiver to be held in escrow subject to the District Court administrative tax determination,

---

**5.** The United States trustee objected only to the Release and Settlement Agreement provisions waiving postpetition interest on bankruptcy claims and providing for immediate payment of the Receiver's superpriority lien claim.

and (ii) pay the remainder of the $3.5 million allocation to bankruptcy estate creditors. Specifically, in said Order, this Court found and ruled in relevant part:

**FINDINGS OF FACT**

22.

. . . .

(b) *Delivery of $1.2 Million dollars to Receiver to be held in escrow.* The Trustee will deliver a check in the amount of $1.2 Million Dollars to the Receiver to be deposited into an interest bearing account and held in escrow for distribution as described below.

. . . .

(d) *Disposition of funds to be held in escrow by Receiver.* The Receiver agreed to hold the $1.2 Million Dollars distributed to him in escrow. Those funds will be held in escrow to be paid out in the following order of priority and at the following times: (i) first, to the IRS in the amount necessary to fully satisfy all federal tax liabilities ... (ii) next, to all holders of allowed general unsecured claims in the Bankruptcy Cases until said claims have been paid 100% of the allowed amount as set forth in the Accounts, and (iii) then any remaining funds to the Receiver on account of the Mandelman Judgment and pursuant to the Release and Settlement Agreement.

(e) *Interest on the escrowed funds.* Any interest accruals on the $1.2 Million held by the Receiver in escrow shall be retained by the Receiver.

. . . .

Based on the foregoing Findings of Fact and Conclusions of Law, it is hereby

. . .

ORDERED and ADJUDGED that the Receiver's Agreement to act as escrow agent for purposes of making distributions to the IRS (if any) and to general unsecured creditors is approved and the Receiver shall hold in escrow all $1.2 Million Dollars delivered to it pursuant to the Modifications for the benefit of the IRS and the general unsecured creditors of the Debtors. The Receiver will act as an escrow agent with no discretion to disburse funds other than according to the terms of this Order. Notwithstanding the foregoing, the Receiver is authorized to retain any interest accruals on the $1.2 Million Dollars to be distributed to it [.]

(December 30, 1999 Findings of Fact, Conclusions of Law and Order Approving Trustee's Amended Final Accounts at 7, 8, 14–15.)

The United States objected, and subsequently appealed this Court's December 30, 1999 order to the Bankruptcy Appellate Panel for the First Circuit (the "BAP"), but without seeking any stay pending appeal.

The BAP agreed with the United States. In its ruling of March 13, 2001 in *United States of America v. Sterling Consulting Corp. (In re Indian Motocycle, Co.)*, 259 B.R. 458 (1st Cir. BAP 2001), *vacated and superseded* on April 26, 2001, 261 B.R. 800 (1st Cir. BAP 2001) (the "BAP Decision"), the BAP reversed this Court's December 30, 1999 order and remanded. It held that this Court improperly ceded jurisdiction of the bankruptcy estates' administrative tax liability to the District Court and had no right to abstain to the District Court because that court "was without jurisdiction to determine the tax liabilities of the bankruptcy estates, which are core matters within the exclusive jurisdiction of the bankruptcy court." *In re Indian Motocycle, Co.*, 261 B.R. at 808. The BAP further held that this Court had no authority to estimate the administrative tax liability un-

der 11 U.S.C. § 502(c) in light of the rights afforded the United States under 11 U.S.C. § 505(b). Accordingly, the BAP reversed both this Court's order limiting the tax liability of the bankruptcy estates to the United States and the order making the final distributions. *Id.* at 810. And, as to the latter, the BAP's attention was squarely fixed on reversing the distribution of the $1.2 Million Dollars delivered in escrow to the Receiver. *Id.* at 806.

On April 10, 2001, the Tenth Circuit Court of Appeals issued a complementary ruling (the "Tenth Circuit Decision"), reversing the District Court's order accepting jurisdiction to determine the said tax. *Sterling Consulting Corp. v. United States*, 245 F.3d 1161 (10th Cir.2001). It ruled, inter alia, that, (i) pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a) and its exemptions, district courts are precluded from making declaratory judgments with respect to the federal taxes owed by bankruptcy estates, except as permitted by 11 U.S.C. §§ 505 and 1146, *Id.* at 1165–66, and (ii) the jurisdiction to invoke § 505 is limited to the district court in which the bankruptcy case is filed. *Id.;* 28 U.S.C. § 1334(b). The court specifically noted that, while this Court attempted to cede jurisdiction of the tax dispute to the District Court, it did not "effectuate a transfer of the bankruptcy proceeding to the district court in Colorado pursuant to 28 U.S.C. § 1412, which might have conferred jurisdiction on the [District Court] over a § 505 action." *Id.* at 1166.

This Court is advised that the BAP Decision has been appealed by the Receiver and/or the Trustee to the First Circuit Court of Appeals, and that the time within which the Receiver may seek reconsideration or Supreme Court review of the Tenth Circuit Decision has not yet expired. Notably, however, as of this late date, this Court is aware of no request (or if a recent request has been made, no allowance) of a stay of the BAP Decision pending appeal to the First Circuit.

On May 16, 2001, the United States filed the Government Motion. In that Motion, the United States complains that, in light of the BAP Decision reversing this Court's December 30, 1999 order, it was incumbent upon the Receiver to return the escrowed money to the Trustee when the automatic ten-day stay applicable to the BAP Decision (Fed. R. Bankr.P. 8017(a)) expired on May 7, 2001. The failure to do so, the United States contends, was and continues to constitute a violation of the automatic stay under § 362(a)(3). This Court ought, therefore, to order the Receiver to return the money to the Trustee's control and award damages to the United States on account of the stay violation. Furthermore, the United States complains that the Receiver, notwithstanding the terms of the BAP Decision and the Tenth Circuit Decision (each having ruled that the validity of the United States administrative tax claims against the bankruptcy estates may not be determined in the District Court), is continuing its efforts in the Receivership Proceeding to elicit discovery from the United States with respect to those very potential claims. Those actions, the United States argues, constitutes yet another violation of the automatic stay under § 362(a)(6). This Court ought, therefore, to enjoin that discovery and award the United States damages on account of the stay violation.

In the Government Motion, the United States asked this Court to order the Receiver to return the escrowed funds *ex parte*, and afford the Receiver an opportunity to seek reconsideration. Its reasoning was as follows. According to the United States, the Receiver, on more than one occasion, had threatened to have counsel

for the United States found, personally, in contempt of the District Court if the United States sought any affirmative relief in this Court. The Receiver allegedly based that position on an earlier decision of the District Court in *Eller Indus., Inc. v. Indian Motorcycle Mfg., Inc.,* 929 F.Supp. 369 (D.Colo.1995). In *Eller Industries,* the District Court, at a time prior to the agreement of the Receiver and the Trustee to market the assets together and "cooperatively," and in response to this Court's order enjoining the Receiver from dissipating, encumbering or transferring those assets, enjoined any equitable actions against the Receiver.[6] According to the United States, the Receiver took the position that the escrowed funds, once transferred to the possession of the Receiver, constituted property of the receivership, notwithstanding the BAP Decision reversing this Court's order of transfer and the Tenth Circuit Decision commenting approvingly thereto. And, according to the United States, if the Receiver was granted advance notice of the Government Motion, the Receiver might, in the interim, solicit an order from the District Court which would seek to interfere with the United States' prosecution of the instant Motion. Indeed, the United States argued that the nature of the Receiver's relationship with or access to the District Court might facilitate a swift order to attempt to preclude this Court's consideration of the Government Motion.[7] Such an action was considered by the United States to be quite problematic, as the United States was concerned about the applicability of a 10th Circuit Court of Appeals case, *Cessna Aircraft Co. v. Brown,* 348 F.2d 689 (10th Cir.1965). According to the United States, the *Cessna Aircraft* case held that "in cases where priority of jurisdiction as between two courts is at issue, it is best if the Court in which jurisdiction was first invoked (correctly or incorrectly) concludes its proceedings and all appeals are exhausted, while any court in which jurisdiction was subsequently invoked should hold the matter in abeyance." (Government Motion ¶ 14.) Therefore, the United States feared that if the Receiver was

---

6. That decision was not appealed by the original Trustee to the Tenth Circuit Court of Appeals. However, this Court need not opine here as to whether the District Court had then the subject matter jurisdiction to impose control over assets, title to which was also claimed on behalf of the bankruptcy estates. There is no question but that the District Court then believed that the entity in receivership (and, therefore, the Receiver) had an equally arguable claim to title to those assets. But now the allocation of the funds between the receivership and the bankruptcy estates has been completed. Accordingly, the *Eller Industries* decision does not apply to the escrowed funds. They are property of bankruptcy estate, subject to this Court's exclusive jurisdiction. *See* 28 U.S.C. §§ 1334(a) and 157(a); 11 U.S.C. § 541(a). *Cf. Sterling Consulting Corp.,* 245 F.3d at 1166; *In re Indian Motocycle, Co.,* 259 B.R. 458 (1st Cir. BAP 2001), *vacated and superseded,* 261 B.R. at 808.

7. Footnote 6 of the Government Motion reads in relevant part:

> The Receiver has on more than one occasion told government counsel that the Colorado court considers the Receiver to represent the court itself, and will defer to the Receiver generally. The Receiver has even argued (during a hearing before the Magistrate Judge in Colorado) that the Receiver is like a magistrate judge, whose proposed determinations can not be overturned unless shown to be an abuse of discretion. In a recent hearing before this Court, the Receiver's counsel stated that the Receiver is like a "law clerk" and is free to communicate *ex parte* with the Colorado court. While the Colorado court itself has never indicated whether it agrees with the Receiver's views in these respects (and the United States believes they are wrong), the Colorado court has on occasion entered orders at the Receiver's request, without adequate notice.

granted advance notice of the Government Motion, it might secure an *ex parte* order of the District Court precluding consideration of the Government Motion. If this Court were to decide first, the Receiver would be forced to appeal and not have the ability to collaterally attack the order.

In its Order and Memorandum of Decision of May 18, 2001, this Court denied the request by the United States for an *ex parte* determination of any part of the Government Motion. Besides finding that insufficient grounds were presented for *ex parte* relief, this Court expressed some distaste for the presentation to this Court, as grounds for *ex parte* relief, of its criticism of practices by the District Court. This Court then scheduled the Government Motion for hearing on the merits for June 7, 2001.

On May 24, 2001, the Receiver filed a motion asking that the June 7, 2001 hearing on the Government Motion be continued for approximately one week to the week of June 14, 2001, so that its principal, Richard Block, could be present. After adjusting for a potential conflicting appointment by counsel to the United States, the Court rescheduled the hearing for June 11, 2001. However, in the interim, the Receiver asked the Magistrate to schedule a prompt hearing on the Receiver's 34th Report to the District Court. That Report, which the Receiver asked that the District Court approve as an order of the District Court, argued that the escrowed funds were part of the receivership estate, and that the United States would be bound by that order if it failed to object. It also sought instructions from the District Court as to what litigating posture to take before this Court. *See "Notice of Colorado Court's Determination to Set Hearing on June 7, 2001, to Assure That it Takes Place Before this Court's June 11, 2001 Hearing on Pending Emergency Motion to Enforce BAP Judgment,"* filed by the United States on June 5, 2001 (the "June 5 Notice"). Attached to that June 5 Notice, was a sworn *Declaration of Noreene Stehlik (June 4, 2001)* (the "Stehlik Declaration"), counsel for the United States, which described the following telephone exchanges between the parties and the Magistrate attempting to select an appropriate date for the hearing before the Magistrate. According to the Stehlik Declaration:

8. Both Mr. Tanner [counsel to the Receiver] and Mr. Block were adamant that the hearing before [Magistrate] Judge Schlatter had to occur before June 11, which was the date for the bankruptcy hearing before Judge Boroff, in Massachusetts. Mr. Block also stated that he would not have time to prepare properly for the bankruptcy hearing if the hearing in Colorado was on June 11. I stated that the Receiver's 34th Report was not before Judge Boroff for approval, and there was no need to have the hearing in the Colorado case the week of June 4, 2001.

9. Judge Schlatter was in agreement with Mr. Tanner and Mr. Block that the Colorado hearing had to occur before the bankruptcy court hearing. Judge Schlatter said that Judge Boroff's ruling with respect to the funds would affect him and [District] Judge Weinsheink, because "it's the [Colorado] court's money." I replied that, by the terms of Judge Boroff's (December 30, 1999) order, the receiver was acting as an escrow agent.

10. Mr. Block explained that he needed "instructions" from Judge Schlatter before appearing before Judge Boroff. I stated that it was not appropriate for Judge Schlatter to give instructions to a party in an adversarial matter.

Ultimately, the Magistrate set the date of his hearing for June 7, 2001. But no order arose therefrom. Nevertheless, during the course of the hearing, the Magistrate did opine on a number of issues.[8] First, he defined the purpose of the hearing to be his intention to provide the Receiver with directions, but not to issue any orders. (June 7, 2001 Tr. at 5.) Second, the Magistrate attempted to characterize the location and status of the escrowed funds for the benefit of the United States and this Court. He stated in relevant part:

> ... the Government is concerned about the fact that $1.2 million has not been returned by the Receiver. The Receiver doesn't have the power to return it. That money is in the registry of the Court here in Colorado. He could not walk up to the counter and ask for the money to be given to him, so that he could take it to Massachusetts. Even if the Bankruptcy Court in Massachusetts ordered him to return the money, or ordered this Court, ordered the registry of the Court to return the money. That would be ineffective. That money is in the registry of this Court, and can only be released with an order of this Court....

> And if it's possible, I'm going to attempt to e-mail Judge Boroff, before his hearing on Monday [June 11], to at least let him know that it's not the Receiver that's withholding those funds, it's me that's withholding those funds.

> Now, I'm not saying that it's the property of Colorado. I'm not saying that it's the property of the receivership estate.... Whether they should be in Massachusetts or not, it's not a matter which I have before me, and I'm not

going to say today that's the property of this Court or the property of the Receiver. I leave that for another date. But my remark is intended to communicate to you, Ms. Stehlik, and to Judge Boroff as well, if I can, that it's not the Receiver's fault that he's unable to have that money transferred to Massachusetts. And frankly, I'm not sure why it needs to be transferred there.

(June 7, 2001 Tr. at 8–9.) Following other argument not germane to the issues now before this Court, the Magistrate provided the direction sought by the Receiver:

> Here's what I want to do.... I just feel that there's great stress and confusion between Massachusetts and Colorado now, as a result of the motions, frankly, that's been filed by the Government. And I've given a lot of thought to how to go about solving the problem or at least attempting to solve the problem. And here's what I'm directing the Receiver to do.... I don't practice before Judge Boroff. I am going to attempt to communicate with him and provide him with these thoughts and my comments. But I'm directing the Receiver to request of Judge Boroff that he change venue of the bankruptcy case to the District of Colorado.

(June 7, 2001 Tr. at 20.) The Magistrate then went forward to explain his reasoning for the propriety of a venue change, the essential terms of which discussion are set forth in the Venue Motion. The balance of the hearing was spent in the Receiver's request for authorization to take certain positions in litigation (some granted, some taken into consideration), in the complaints by the United States that the Receiver's 34th Report unfairly tarnished the reputation of its counsel, and in the Magistrate's

---

8. A copy of the transcript of the hearing was attached to the Receiver's opposition to the Government's Motion.

complaints that the Government Motion unfairly tarnished the reputation of the District Court. No conclusion was reached on either score.

On June 11, 2001, this Court commenced a nonevidentiary hearing on the Government Motion and the issues were explored. During the course of the hearing, the Court was asked if it had received the promised communication from the Magistrate. In response, this Court replied that it had received a letter from the Magistrate transmitted by facsimile and directed to chambers. However, in light of the statements of concern made by the United States in the Government Motion with respect to *ex parte* communications alleged to have transpired in Colorado, this Court decided not to read the letter and instructed his staff to seal it. During the balance of the hearing, this Court attempted to bring the parties to an interim resolution on the disposition of the escrowed funds, hoping that the question of when and whether the funds would be transferred could be deferred until the completion of the United States audits. This Court asked the parties to consider such an interim resolution and continued the hearing to June 15, 2001.

Notwithstanding the Court's decision not to read the Magistrate's letter, the Receiver filed it on June 14, 2001, attached to a notice filed by the Receiver. The notice indicated that the Receiver was holding $1.2 Million and would hold it and any accruing interest in a segregated account.

At the hearing on June 15, 2001, the United States waived objection to this Court's reading of the Magistrate's letter, subject to this Court's assurance that it would not consider anything there said to be anything other than the personal views of the Magistrate.[9] However, the hearing then took a turn for the worse when the Court and the United States inquired as to the status of the escrowed funds and the accrued interest, including the interest accrued since the BAP Decision. Mr. Block, for the Receiver, told the Court that the funds had been held by the Receiver (and not by the Clerk of the District Court) in an interest bearing account commingled with other funds of the Receivership estate. Interest earned on all of the funds was regularly transferred to an operating account maintained by the Receiver for payment of the regular expenses of the receivership. Those transfers were made by the Receiver's part-time bookkeeper who had standing instructions and authority to make those transfers and payments without additional authorization from Mr. Block.[10] (June 15, 2001 Tr. at 23–26.) Mr. Block was unable to tell the Court how much might have been earned on the account before and after the BAP Ruling of April 26, 2001. *Id.* He could, however, tell the Court that no transfers were made after June 7, 2001 and he could tell the Court that all other funds in the receivership were now "nominal," by which he meant between $0–$20,000. *Id.* at 13–14. Undeterred (and in retrospect unrealistic), this Court urged the parties to explore any possible avenue to resolve their dispute,

---

9. The Court has read the Magistrate's letter. It is a courteous but direct reiteration of the Magistrate's views essentially as he expressed them to the parties in the June 7, 2001 hearing in Colorado.

10. The Receiver's counsel never wavered from the position that this arrangement constituted the "registry" of the District Court.

On June 19, 2001, the Receiver filed a Notice, attached to which was an order dated August 4, 1997, with respect to an unrelated matter in the receivership case. In that order, titled "Order Regarding Receivership as Registry of Court," the Magistrate opined that the Receiver "is the registry of the court."

and the matter was continued to June 18, 2001. Not unexpectedly, the June 18 hearing produced no better news, and this Court took the Government Motion under advisement.

On June 21, 2001, the Receiver filed the Venue Motion. The United States filed its opposition on July 10, 2001. On July 17, 2001, this Court heard the parties a fourth (4th) time in this very difficult matter. Following that hearing, the Venue Motion was also taken under advisement.

## II. DISCUSSION

A. *Turnover of the Escrowed Funds and 11 U.S.C. § 362(a)(3).*

This Court begins by describing first what the Receiver is holding, what the Receivership Proceeding constitutes, and why that matters.

■ 28 U.S.C. § 1334(a) grants to the district court original and exclusive jurisdiction over all cases under title 11. By reference from the district court, pursuant to 28 U.S.C. § 157(a), bankruptcy courts acquire that original and exclusive jurisdiction, including jurisdiction over all property of the estate, wherever located. 11 U.S.C. § 541(a); *United States of America v. Sterling Consulting Corp. (In re Indian Motocycle Co.)*, 261 B.R. 800, 807 (1st Cir. BAP 2001); L.R. D. Mass. 201 ("Pursuant to 28 U.S.C. § 157(a), any and all cases arising under Title 11 United States Code and any and all proceedings arising under Title 11 or arising in or related to a case under Title 11 shall be referred to the judges of the bankruptcy court for the District of Massachusetts.")

11 U.S.C. § 541(a) defines property of the estate to include, subject to exceptions not relevant here:

(1) . . . all legal or equitable interests of the debtor in property as of the commencement of the case; [and]

. . . .

(6) Proceeds, product, offspring, rents and profits of or from property of the estate . . . .

■ These broad statements beg a very important question. Before one can decide whether property is property of the estate, one must first determine that it was ever property of the debtor. That issue predominated the earliest stages of these cases. If the Indian Motorcycle Trademarks belonged to the bankruptcy debtors, then this Court had exclusive jurisdiction to determine their disposition. If those Trademarks belonged to the receivership debtor, then the District Court had that exclusive jurisdiction. The cross injunctions first ordered by this Court and then countered in the District Court's *Eller Industries* decision illustrated the futility of either court attempting to impose a result on the other in the absence of that critical determination. Surely, this Court and the District Court would have eventually sorted it out, but perhaps not without substantial delays and appellate proceedings. And it did not take very long for at least this Court, and undoubtedly the District Court as well, to realize that the Receiver and the Trustee were engaged in a debilitating battle over ownership and control (amongst each other and with third parties also claiming ownership and other rights) that was certain to result in a deterioration of the value of the trademarks to the prejudice of both. To the credit of both courts,[11] each began to apply sure but steady pressure upon the Receiver and Trustee, urging them to finds ways to resolve their competing claims. And to the credit of the Receiver and the Trustee (and no less to the Magistrate who bro-

---

11. This Court apologizes for its immodesty in claiming but a small part of that credit.

kered some of the more difficult agreements), resolutions were found by which both courts could cooperate with one another for the benefit of both the receivership and bankruptcy estates. As this Court commented in its Memorandum of Decision of May 18, 2001, "the administrative success of each estate has been testament to this mutual exercise of abstention grown out of comity."

■ Today, the unsettled state of title to the Trademarks and now their proceeds has been resolved by orders of both courts. The sale of the assets to IMCOA, approved by both courts, set aside a specific allocation for bankruptcy estate creditors. And, to the extent that the status of those funds was in any way obfuscated by the joint signature rights of the Receiver to the allocated funds and the Receiver's reservation of rights to assert competing claims, the Release and Settlement Agreement, also approved by both courts, cleared up any possible confusion. In that agreement, the funds were entrusted to the sole control of the Trustee and the Receiver's rights were reduced to its claims against those funds. Those receivership claims are undoubtedly of concern to the Receiver and the District Court, but they are no different in kind to the claims of any other creditor of the bankruptcy estates. Accordingly, since at least September 21, 1999, when this Court approved the Settlement Motion, the $3.5 Million Dollars allocated to the bankruptcy estates has been property of the bankruptcy estates.

The United States argues that, since April 26, 2001, when the BAP reversed this Court's order of December 30, 1999, the Receiver has been wrongfully in control of the bankruptcy estate property, and that it was incumbent upon the Receiver to return the monies (and any accrued interest) forthwith. The Receiver (with the obvious support of the Magistrate) argues that the Receiver is actually the arm of the District Court, that the funds are in *custodia legis* of the District Court and, therefore are not subject to an order of this Court absent approval of the District Court.

■ Sound administration of a receivership demands that assets of a company under receivership be viewed as under the exclusive control of the receivership court (i.e., in *custodia legis* ) and that there be no unwarranted interference with the receiver's actions or with the property which the receiver is charged to administer. Accordingly, as early as 1881, the Supreme Court recognized in *Barton v. Barbour*, 104 U.S. 126, 26 L.Ed. 672 (1881) that the common law barred suits against receivers in courts other than the court charged with the administration of the estate. *See also LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 3–5 (1st Cir.1999), *cert. denied*, 530 U.S. 1230, 120 S.Ct. 2661, 147 L.Ed.2d 275 (2000). But even the *Barton* court noted that these common principles were not without limitation. Where the receiver, mistakenly or wrongfully takes goods belonging to another, the receiver acts *ultra vires* and the receiver may be pursued personally for return of the property as a matter of right. *Barton*, 104 U.S. at 134. A receiver can be ordered to turn over funds that are not part of the receivership estate. *Cf. Lasker v. McDonnell & Co.*, 1973 WL 1298, *3 (Del.1973) ("If at the time of receivership an insolvent corporation holds the property of another, the right owner may reclaim his property or the proceeds from sale thereof if he can identify the property or trace the proceeds into a specific fund or account."); *New York Stock Exchange v. Pickard & Co.*, 274 A.2d 148 (Del.Ch.1971) (property deliv-

ered to the receiver by mistake should be returned to the proper owner).

Here, the Trustee transferred property of the bankruptcy estate to the Receiver for a specific purpose, being payment of any allowed claims of the United States, as determined by the District Court, and payment of the residue, if any, to creditors and equity security holders. It was sent *in escrow* for that purpose. That purpose failed when the order of this Court which authorized the transfer was reversed by the BAP and when the jurisdictional basis for the District Court tax determination was reversed by the Tenth Circuit Court of Appeals. The purpose of the escrow having failed, it is incumbent upon the Receiver to return the property to which it has no right.[12]

Further support for return of the funds can be gleaned from the Bankruptcy Code itself, federal law to which the Receiver is no less subject. Under 11 U.S.C. § 101(11), the term "custodian" is defined as follows, in relevant part:

(A) *receiver* or trustee of any of the property of the debtor, appointed in a case or proceeding not under this title;

. . .

(C) trustee, *receiver*, or agent under applicable law, or under a contract, that is appointed or authorized to take charge of property of the debtor for the purpose of enforcing a lien against such property, or for the purpose of general administration of such property for the benefit of the debtor's creditors[.]

(Emphasis added.)

Pursuant to 11 U.S.C. § 543:

(a) A custodian with knowledge of the commencement of a case under this title concerning the debtor may not make any disbursement from, or take any action in the administration of, property of the debtor, proceeds, product, offspring, rents, or profits of such property, or property of the estate, in the possession, custody, or control of such custodian, except such action as is necessary to preserve such property.

(b) A custodian shall—

(1) deliver to the trustee any property of the debtor held by or transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case; and

(2) file an accounting of any property of the debtor, or proceeds, product, offspring, rents, or profits of such property, that, at any time, came into the possession, custody, or control of such custodian.

(c) The court, after notice and a hearing, shall—

(1) protect all entities to which a custodian has become obligated with respect to such property or proceeds, product, offspring, rents, or profits of such property;

(2) provide for the payment of reasonable compensation for services rendered and costs and expenses incurred by such custodian; and

(3) surcharge such custodian, other than an assignee for the benefit of the debtor's creditors that was appointed or took

---

**12.** The Court notes again that the 1995 injunction by the Colorado district court staying all equitable actions against the Receiver and the receivership estate, *Eller Indus., Inc. v. Indian Motorcycle Mfg.*, 929 F.Supp. 369 (D.Colo.1995), does not apply to the Government Motion. The District Court has exclusive jurisdiction only with respect to receivership assets or the administration of the receivership estate. *Id.* at 372. The relief sought here is not with respect to the administration of the receivership assets.

possession more than 120 days before the date of the filing of the petition, for any improper or excessive disbursement, other than a disbursement that has been made in accordance with applicable law or that has been approved, after notice and a hearing, by a court of competent jurisdiction before the commencement of the case under this title.

(d) After notice and hearing, the bankruptcy court—

(1) may excuse compliance with subsection (a), (b), or (c) of this section if the interests of creditors and, if the debtor is not insolvent, of equity security holders would be better served by permitting a custodian to continue in possession, custody, or control of such property, and

(2) shall excuse compliance with subsections (a) and (b)(1) of this section if the custodian is an assignee for the benefit of the debtor's creditors that was appointed or took possession more than 120 days before the date of the filing of the petition, unless compliance with such subsections is necessary to prevent fraud or injustice.

The Court recognizes that § 101(11) and § 543 refer to "property of the debtor" and not to "property of the estate." However, in light of the definition of property of the estate as including "all legal or equitable interests of the debtor in property as of the commencement of the case," § 541(a), it is clear that both §§ 101(11) and 543 apply. The Receiver's status is well within the definition of a "custodian" of bankruptcy estate property and it is obligated to return that property to the Trustee, pursuant to § 543(b)(1).[13]

▮▮▮▮▮ In his statements as reported by the parties, or in open court, or in his letter to this Court, the Magistrate has stated or implied that the escrowed funds are in the "registry" of the District Court, that he (and the District Court Judge) are the true escrowees and that the funds are in *custodia legis* of the District Court. None of these statements are orders of the District Court. Statements made by a judge in open court, ruminating on the dispute before the court is not an order or judgment. *See BIW Deceived v. Local S6, Indus. Union of Marine & Shipbuilding Workers of Am.,* 132 F.3d 824, 829 (1st Cir.1997); *Logue v. Dore,* 103 F.3d 1040, 1047 (1st Cir.1997). However, to the extent that this Court correctly understands those views and the Magistrate continues to adhere to them, this Court respectfully disagrees. The funds are not under the control of the clerk of the District Court; they are in a bank account held by the Receiver.[14] Neither the Magistrate nor the District Judge is the escrowee and holder of the subject property of the bankruptcy estate. The Receiver may be a court functionary, but it is neither a Magistrate nor a District Judge and it does not have the judicial immunity of either. And, having started out as bankruptcy estate property since September 21, 1999 and having been sent *in escrow* to the Receiver for a stated but failed purpose, the subject funds are simply not receivership property. They are property subject to this Court's exclusive jurisdiction. *See* 28 U.S.C. § 1334(a).

---

**13.** This Court also recognizes that the Court is afforded some measure of discretion under § 543(d)(2). However, the Court will not exercise that discretion for the same reasons stated below for its determination not to transfer venue of the tax determination or these cases under 28 U.S.C. § 1412.

**14.** If the funds were under the control of the Clerk of the District Court, the result might be no different.

In addition, when a case has been decided by the appellate court or panel, the lower court can address issues left open by the appellate mandate. *Williams v. Citifinancial Mortgage Co. (In re Williams)*, 256 B.R. 885, 895 (8th Cir. BAP 2001); *Delgrosso v. Spang and Co.*, 903 F.2d 234, 240 (3rd Cir.1990). In light of the BAP Decision, this Court has a duty to order the escrowed funds returned. *See Northwestern Fuel Co. v. Brock*, 139 U.S. 216, 11 S.Ct. 523, 35 L.Ed. 151 (1891) (after a reversal, the lower court has jurisdiction to restore the parties to their former position "so long as the parties and the case are properly before it, either in the first instance or when remanded to it by [the appellate court]."); *Baltimore & O.R. Co. v. United States*, 279 U.S. 781, 785–786, 49 S.Ct. 492, 73 L.Ed. 954 (1929) (when an order is reversed, it is the duty of the lower court to retain jurisdiction of the case and enter a decree that appellant is entitled to restitution). Therefore, this Court can and must order the Receiver to return the escrowed funds to the Trustee.

Finally, this Court finds the arguments of the United States—to the effect that the Receiver has violated the provisions of 11 U.S.C. § 362(a)(3)—to have little merit at this time. That section provides that any action to "obtain possession of property from the estate or to exercise control over property of the estate" is stayed. But the Receiver properly obtained possession of the escrowed funds by this Court's order of December 30, 1999. Fundamental fairness alone dictates that the reversal of that order not be interpreted to subject the Receiver to a retroactive risk of liability under § 362(a)(3). And, as for the exercise of control of the escrowed funds since April 26, 2001, the date of the

BAP Decision, the Receiver has not, until now, been ordered to return those funds to the Trustee. Accordingly, the Receiver can not be said, until and unless it fails to comply with this Court's order issued today, to have imposed wrongful control over the escrowed funds.

There, unfortunately, remains the question of the status and disposition of the interest accrued on the escrowed funds both prior to and since the BAP Decision. Although Mr. Block, on behalf of the Receiver, did indicate that the interest had been spent on receivership expenses and that the remaining funds in the estate were "nominal," he did not exhibit any real certainty. Further, the United States also appeared unsure as to how best to characterize or treat the question of this accrued interest. With the parties seemingly uncertain, this Court deems it best to simply order the Receiver to remit to the Trustee the $1.2 Million Dollars, plus interest accrued on and after June 7, 2001 and to order the Receiver to also file an accounting with respect to all of the interest earned on the escrowed funds since the date it received the funds from the Trustee under this Court's order of December 30, 1999. This Court will leave it to the Trustee and/or the United States to seek any further relief if they so choose on the basis of that accounting.

## B. *Discovery in the District Court and 11 U.S.C. § 362(a)(6)*

The United States goes on to argue that the Receiver continues to flout the tenets of the BAP Decision and the Tenth Circuit Decision with its ongoing discovery in the District Court with respect to any claim of the United States in the bankruptcy estates.[15] That effort, says the United

---

15. The Court was informed by the United States that it has filed one or more motions for protective order in the District Court, but those motions have not been acted upon.

States, is intended to interfere with the resolution of that claim in this Court, and, therefore, violates 11 U.S.C. § 362(a)(6). Section 362(a)(6) stays "any act to collect assess, or recover a claim against the debtor that arose before the commencement of the case under this title[.]" 11 U.S.C. § 362(a)(6).

 A proper examination of the arguments made by the United States must begin with the question of whether it has standing to raise any violation of the automatic stay against the bankruptcy estates which might affect its interests. The Courts have answered that question clearly. The automatic stay is intended to both provide debtors breathing space from their creditors *and* prevent unfair distribution of estate assets among creditors. *See Superior Paint Mfg. v. Lopez–Soto (In re Lopez–Soto),* 764 F.2d 23, 27 (1st Cir. 1985); *Barnett Bank of Southeast Ga. v. Trust Co. Bank of Southeast Ga. (In re Ring),* 178 B.R. 570, 577 (Bankr.S.D.Ga.1995)(stating that it is within the statutory scheme of § 362 to protect creditors as well as debtors from violations of the automatic stay); *Homer Nat'l Bank v. Namie,* 96 B.R. 652, 655 (W.D.La. 1989)(one of the basic goals of the Bankruptcy Code is to prevent creditors from being treated inequitably in the distribution of the estate).

 Courts have uniformly held that § 362(a)(6) should be interpreted broadly in order to prevent creditor coercion or harassment against the debtor. *See In re Mateer,* 205 B.R. 915 (C.D.Ill.

1997); *In re Guinn,* 102 B.R. 838 (Bankr. N.D.Ala.1989). However, this Court has been able to find no precedent for its use by a creditor to stop another creditor from employing discovery in another court to investigate the claims of the former in the bankruptcy case. The United States cites no such case. But the actions of the Receiver do appear designed to reduce or eliminate the claim of the United States in order to improve the distribution of bankruptcy estate assets to the Receiver, and the Receiver has provided this Court with no sound contrary reason for its actions. The BAP Decision and the Tenth Circuit Decision are definitive in their jointly held view that the jurisdiction to determine the claim of the United States is exclusively in this Court. And, but for this Court's order of December 30, 1999 ceding jurisdiction to the District Court, which was reversed, the parties had already agreed on the exclusivity of this Court's jurisdiction to determine the tax claims.[16]

In light of the foregoing, this Court finds that the Receiver's attempt on and after April 26, 2001 (the date of the BAP Decision) to conduct discovery in the District Court relative to the claim of the United States in the bankruptcy cases was and continues to be a violation of the automatic stay under § 362(a)(6). Accordingly, this Court will order the Receiver to cease those activities forthwith.

 The United States goes further. It asks for monetary sanctions for its litigation expenses. However, the United States has not provided this Court with

This Court was not specifically advised what grounds the United States asserted. However, in the Government Motion, the United States complains that deposition notice directed to the IRS "contains 60 paragraphs of subject areas for witness designation(s), the vast bulk of which are not directed at ascertaining facts bearing on the correct tax liability . . ., but rather are directed at carrying out the Receiver's oft-repeated threats to 'investigate' the IRS motivations and procedures and for alleged government misconduct." (Government Motion ¶ 19.)

16. *See* § 11(c) of the Release and Settlement Agreement, *supra* p. 7.

the specifics necessary to quantify those expenses. The United States admits that not all of the discovery in the District Court which it sought to quash related to the bankruptcy claims and surely the Government Motion would have been brought for the other reasons alleged by the United States even if this § 362(a)(6) allegation had not been raised. Further, even as to the claimed violations of the automatic stay, the United States did not separately identify its litigation expenses arising from its § 362(a)(3) claim—which was not accepted from those arising from its § 362(a)(6) claim. It was the obligation of the United States to better identify its damages on account of the automatic stay violation alleged, even assuming the Court had the authority to award such damages.[17] Therefore, the claim of the United States for monetary damages arising from the Receiver's violation of the automatic stay under § 362(a)(6) must be denied.

## C. *The Venue Motion*

Finally, the Court turns to the Receiver's (ever increasingly attractive) motion seeking that this Court transfer the venue of the bankruptcy cases, in whole or in part, to the District of Colorado, pursuant to 28 U.S.C. § 1412.

28 U.S.C. § 1412 provides:

A district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties.

 Although the situs of venue for the filing of bankruptcy cases is often the subject of strongly felt but differing views (*see, e.g., In re Columbia Western, Inc.,* 183 B.R. 660, (Bankr.D.Mass.1995)), where

venue is proper from the outset, courts have been fairly uniform in their consideration of what factors should be examined in order to determine whether and where the venue of a case should be transferred. In *N. Parent, Inc. v. Cotter & Co. (In re N. Parent, Inc.),* 221 B.R. 609 (Bankr. D.Mass.1998), this Court noted that the

[f]actors which a bankruptcy court should consider in determining whether to order a transfer [of case venue] under § 1412 should include:

(1) the proximity of assets, creditor, debtor, its principals, evidence and witnesses to the court;

(2) the economical and efficient administration of the estate;

(3) the willingness of abilities of parties, debtor and creditors alike, to participate in the case or in the adversary proceeding, vis a vis one venue over another;

(4) the availability of compulsory process for attendance of unwilling witnesses and the cost of obtaining attendance;

(5) the applicability of state law to the case and adversary proceedings;

(6) the intertwined relationships between debtors;

(7) the necessity for ancillary administration; and

(8) a local interest in having a localized controversy decided at home.

*In re N. Parent, Inc.,* 221 B.R. at 631. *See also In re Columbia Western, Inc.,* 183 B.R. 660, 663 (Bankr.D.Mass.1995) (citing *In re Toxic Control Technologies, Inc.,* 84 B.R. 140, 143 (Bankr.N.D.Ind.1988)). This Court also noted that " '[t]he most important factor is said to be the economic and

---

**17.** That authority is less than clear inasmuch as § 362(h) may be inapplicable since it relates only to stay violations against debtors, and the Court would have to resort to § 105(a) as a basis of its jurisdiction.

efficient administration of the estate.'" *Id.* (citations omitted).

The parties focus on the foregoing list of nonexclusive factors, but draw different conclusions. The Receiver argues that:

the assets of the bankruptcy estates are in the registry of the District Court; the Receiver is effectively the only principal of any of the Debtors; most of the paperwork and other evidence relative to the tax dispute is in Colorado; the IRS is the only party disputing with any of the Estates; compulsory process is equally available (or unavailable) in either venue; and all of the 'efficiency' facts are greatly enhanced by not allowing the IRS to continue playing one Court against another.

(Venue Motion ¶ 8.)

The Receiver goes on to argue that transferring venue will avoid the risk of inconsistent determinations and that transferring venue to the District of Colorado will stop the United States from engaging in a practice of "goad[ing] jurisdictional disputes."

The United States vigorously opposes the Venue Motion. Interestingly, so does the Trustee (albeit with considerably less vigor). The United States first argues that the Venue Motion is untimely and cites to Fed. R. Bankr.P. 1014(a)(1), which provides in relevant part:

**Cases Filed in Proper District.** If a petition is filed in a proper district, on *timely* motion of a party in interest, and after hearing on notice to the petitioners, United States trustee, and other entities as directed by the court, the case may be transferred to any other district if the court determines that the

transfer is in the interest of justice or for the convenience of the parties.

(Emphasis supplied). This Court disagrees. The issues which the request for venue transfer seeks to resolve are of relatively recent vintage.

 The United States further argues that proper consideration of each of the factors listed above are either neutral in character or lead to the conclusion that the case *not* be transferred to the District of Colorado. Here the Court does agree.

While it is true that the remaining assets of these bankruptcy estates are presently in the District of Colorado, they are only there because they have not yet been returned; and their status in Colorado is that of property of the bankruptcy estates in escrow.[18] The debtors' prepetition principal is absent, but his involvement is unnecessary. The only important actor to the sound administration of these bankruptcy estates is the Trustee. The location of the creditors is irrelevant. Their claims have all been liquidated, and, but for the Receiver, they are not located in the District of Colorado. The evidence necessary to resolve the remaining disputes are as easily obtained or transferred from Colorado to Massachusetts as from Massachusetts to Colorado. Other than the Receiver and Trustee, the witnesses include accountants, Internal Revenue Service employees and other experts who can be found or retained in either location. Compulsory process can be effectuated in either location. But the Trustee has few if any funds readily available from the estate with which to travel to Colorado; he has no counsel actively engaged there. The Receiver has well experienced counsel both in Colorado and in Massachusetts.

---

18. Even in the Receiver's Venue Motion, it states as aforesaid: "the assets of the bankruptcy estates are in the registry of the District Court... [.]" (Venue Motion ¶ 8.) While this Court does not agree that the funds are in the District Court's registry, it notes that wherever the funds are deemed to reside, they are described even by the Receiver as "assets of the bankruptcy estates."

The Receiver, with the assent and encouragement of the Magistrate, argues that judicial economy will be the result of a transfer of the case to Colorado. This Court wishes it were so. It is not. In the event that the case is transferred to Colorado, a new trustee in bankruptcy will have to be appointed for the bankruptcy estates, even if the District Court withdraws the reference. The Trustee will not be able to serve in Colorado. Eligibility to serve as a trustee in bankruptcy in a case under Chapter 7 of the Bankruptcy Code requires that the individual trustee reside or have an office in or adjacent to the judicial district in which the case is pending. 11 U.S.C. § 321(a)(1). No newly appointed trustee in the District of Colorado would be able to represent the interest of the bankruptcy estates efficiently, because there will be insufficient time or resources therefor. Nor can this Court take seriously or take comfort in the Receiver and Trustee's newly formed alliance.[19] If the history of the receivership and bankruptcy cases proves anything, it proves that if the United States succeeds in its claims against the receivership and bankruptcy estates, the Receiver and the Trustee will quickly turn on each other.[20]

The Receiver says that the jurisdictional dispute goaded by the United States will be at long last mooted if this Court transfers venue to Colorado. But this Court has never observed the United States goading a jurisdictional dispute between this Court and the District Court. That term was first used by this Court in its Memorandum of Decision of January 13, 1999 in describing the conduct of the Receiver. To this Court's eyes, the United States, albeit pursuing a course of action, which, if successful, will divert payments from innocent victims of these bankruptcy debtors to federal income tax coffers, has pursued a consistently single-minded determination to keep the bankruptcy tax determination in this Court. And, to date, the United States has been successful in its arguments in front of both the Bankruptcy Appellate Panel First Circuit for the First Circuit and the Tenth Circuit Court of Appeals. Transfer of the bankruptcy cases will not end the litigation over jurisdiction. The United States is sure to appeal any adverse determination here to the First Circuit BAP and to appeal the first determination made by the District Court thereafter to the Tenth Circuit Court of Appeals.[21]

The intertwined relationship of the bankruptcy debtors, the application of state law, and the need for ancillary administration being immaterial to the inquiry here, the Court is left with the final factor listed above, "a local interest in having a localized controversy decided at home." This factor also favors denial of the Venue Motion. For all of the tribulations associated with these bankruptcy cases, they are properly this Court's burden to bear. This Court takes judicial

---

**19.** The Receiver has offered the Trustee an office in the Receiver's commercial space in Colorado in an attempt to comply with (or, in this Court's view, circumvent) the dictates of § 321(a)(1).

**20.** The United States also argues that the dispute should not be referred to Colorado because the Magistrate has become too closely identified with the Receiver's efforts to successfully liquidate that estate and/or with settlement discussions between the Receiver and

the Trustee which directly or indirectly implicate the claims of the United States. In light of the other factors which indicate that transfer of the bankruptcy cases to the District of Colorado is not appropriate, this Court need not reach that question.

**21.** Indeed, the United States has already indicated its intention to have asked this Court for a stay pending appeal if the Venue Motion had been granted.

notice that the city of Springfield in the Western Division of the District of Massachusetts is the ancestral home of the Indian Motorcycle. It was first manufactured here.

Finally, the Receiver argues that, even if this Court is not inclined to transfer the bankruptcy cases in their entirety to the District of Colorado, it may, consistent with 28 U.S.C. § 1412, transfer only the discrete dispute with the United States to the District of Colorado. Oddly, the Receiver cites for authority to *In re Infiltrator Systems, Inc.*, 248 B.R. 715 (Bankr. D.Conn.2000) and *Wittes v. Interco, Inc. (In re Interco, Inc.)*, 139 B.R. 718 (Bankr. E.D.Mo.1992). But in neither of those cases did the bankruptcy judge decide to transfer venue of those disputes. And here, several of the factors which the Court would apply in deciding whether to transfer venue of the discrete dispute with the United States to the District of Colorado are the same as the Court has applied in deciding not to transfer venue of the bankruptcy cases. True, by its order of December 30, 1999, this Court did cede jurisdiction to the District Court in almost the same way. But that is the point. This Court's reading of the BAP Decision reveals the BAP's distaste for the decision which this Court made "ceding jurisdiction" of the bankruptcy tax dispute to the District of Colorado. It is irrelevant whether this Court agrees or disagrees with the BAP Decision. It is this Court's duty to obey. The BAP Decision did not reference 28 U.S.C. § 1412, but the use of that provision to effectuate the same result as this Court attempted to do by abstention would justifiably be viewed as an act to undermine the BAP Decision.[22] That act of disrespect would not constitute sound public policy.

## III. CONCLUSION

In view of the foregoing, this Court deems the $1.2 Million, plus interest accrued on and after June 7, 2001, now held by the Receiver in Colorado, to be property of these bankruptcy estates. This Court will order the Receiver to return those funds to the Trustee within 14 days of the date hereof. Any request made by the United States that the Receiver pay or disgorge to the Trustee interest earned on the $1.2 Million Dollars between April 26, 2001, the date of the BAP Decision, and June 7, 2001 will be denied without prejudice. However, the Court will order the Receiver to file with this Court, within 14 days hereof, a detailed accounting of interest accrued on the escrowed funds on and after December 30, 1999 and the disposition thereof. This Court also rules that any ongoing discovery being conducted in the District Court relative to the claims of the United States against the bankruptcy estates in this Court are a violation of the automatic stay under § 362(a)(6) and orders the Receiver to refrain from proceeding with that discovery or any associated proceedings, forthwith. The balance of the relief sought in the Government Motion (with the exception of the request for *ex parte* relief already denied on May 18, 2001) will be denied. The Receiver's request that venue of the bankruptcy cases be transferred to the District of Colorado, in whole or in part, pursuant to 28 U.S.C. § 1412 will be denied as well.

Separate orders shall enter in conformity herewith.

---

**22.** The Court notes that even the Tenth Circuit Decision never contemplated this type of partial transfer under 28 U.S.C. § 1412.